UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09-CV-00947-H

MILTON ELWOOD STRODER                                                                  PLAINTIFF

V.

COMMONWEALTH OF KENTUCKY
CABINET FOR HEALTH AND FAMILY SERVICES, et al.                        DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff, Milton Elwood Stroder, brings this action against his former employer, the Commonwealth of Kentucky Cabinet for Health and Family Services ("CHFS" or the "Cabinet"), alleging that he was terminated because of his sexual orientation, in violation of his state and federal equal protection rights.[1]

Because Stroder can obtain only equitable relief, the Court conducted a two-day bench trial. Both counsel did an excellent job presenting their evidence and arguing various difficult issues of law. Even after deciding the legal issues, balancing the proper factual influences has proven to be a great challenge for the Court.

Acting as the trier of fact and for the reasons explained herein, the Court concludes that Stroder was terminated from his employment because of his sexual orientation.

**I.**

The following is a general summary of the factual circumstances.

In late 2008, a former CHFS employee, Bader Ali, filed a racial discrimination and sexual harassment lawsuit against his supervisor, Perry Puckett. Although the substance of that

---

[1] Stroder asserted additional claims against Defendants which were dismissed at earlier stages of litigation.

lawsuit is unrelated to the instant one, document production in the Ali case prompted a CHFS staff attorney at the time, Amber Arnett, to review e-mail and internet traffic of all Cabinet employees. Arnett's review revealed rampant violations of the Cabinet's Internet Usage Policy within Stroder's department. That review began a chain of events which ultimately led to Stroder's termination.

Arnett began by reviewing e-mails of employees who frequently communicated with Puckett because these messages were already available as a result of document production for the Ali case. Based on these e-mails, she identified four employees, including Stroder, who appeared to have violated the Internet Usage Policy. Arnett transmitted a list of these employees to Michelle Kent, former Executive Staff Advisor, who was charged with recommending employment actions within the Cabinet. Arnett advised Kent to investigate these four employees, beginning with those on probation in light of the Cabinet's "zero-tolerance" policy toward misconduct by probationary employees.

The two probationary employees on the list were Stroder and Shannon Duncan. Their one-year probationary periods ended on precisely the same day, July 31, 2009. Both Stroder, an openly homosexual male, and Shannon Duncan, a heterosexual married female, were employed as an Adjudicator I within CHFS. Arnett's review of e-mails between these two and Puckett revealed that the two both sent and received inappropriate materials. Next, on July 20, 2009, Kent submitted a request for "snapshots" of both employees' e-mail accounts. Such a request would include all sent, received, and deleted e-mails currently in their accounts. According to Defendants' witnesses at trial, Cabinet policy requires that an employee's snapshot be received

and reviewed before any adverse action is pursued.[2]

On July 30, 2009, just one day before Stroder and Duncan's probationary periods would end, Kent had not received either of their e-mail snapshots. Nevertheless, that morning, Kent initiated a conversation with Arnett about whether Stroder's e-mails that had surfaced during the review of Puckett's account contained violations sufficient to justify termination. The Puckett-Stroder e-mails contained several messages which referenced Puckett's homosexual partner and included homosexual slang. Kent and Arnett exchanged e-mails identifying specific messages that constituted violations of the Internet Usage Policy. Kent and Arnett exchanged no communication and took no action regarding Duncan's e-mails or her separation.

The next day, Stroder's final day of probation, Kent drafted a memo recommending separation based solely upon the inappropriate Puckett-Stroder e-mails. That same day, she received Stroder's snapshot, but it is unclear whether she actually reviewed it prior to recommending termination. In any event, her memo recommending termination referenced those e-mails discovered during the Puckett investigation. Kent's supervisor reviewed the memo and decided to terminate Stroder. Later that day, Stroder received a letter stating his termination, effective immediately. He subsequently filed this action alleging that he was discriminated against because of his sexual orientation.

## II.

Stroder's remaining claim asserts a denial of his equal protection rights under § 1983. Allegations of discrimination on the basis of sexual orientation are analyzed under the rational

---

[2] The Court received no documentary evidence of such a policy. This absence of evidence does not affect the decision here.

basis standard because no suspect or quasi-suspect class is concerned. *Equality Found. Of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 293 (6th Cir. 1997). The familiar *McDonnell Douglas* framework provides the preliminary basis for analyzing such a claim. *Brewer v. Cleveland Mun. Sch. Dist.*, 84 F. App'x 570, 572 (6th Cir. 2003).[3] A plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated differently than a similarly-situated member of the unprotected class. *Keys v. Humana, Inc.*, 3:09-CV-834-S, 2010 WL 2961186, at *2 (W.D. Ky. July 26, 2010). Here, Stroder established his prima facie case of discrimination. This merely shifts the burden on the defendant to "'articulate some legitimate, nondiscriminatory reason' for taking the challenged action." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (citation omitted).

Defendants say that violating the Internet Usage Policy could be a very legitimate nondiscriminatory reason for terminating a probationary employee. They are undoubtedly correct about this. And, thus, Plaintiff faces the daunting task of proving, by a preponderance of the evidence, that the proffered legitimate reason was actually a pretext to hide unlawful discrimination. He can do this only by showing that the proffered reason "did not actually motivate the defendant's challenged conduct."[4] *Id.* (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Thus, the determination of this case rests entirely on whether Stroder has shown by a preponderance of the evidence that his termination was actually based

---

[3] This is the same framework for analyzing Title VII disparate treatment cases. However, Title VII does not recognize a claim for disparate treatment based on sexual orientation.

[4] The other two potential avenues; that the proffered reason has no basis in fact or that it was insufficient to warrant the challenged activity, do not provide such a showing here.

upon his sexual orientation, rather than his admitted violation of the Internet Usage Policy.

**III.**

The Court focuses its analysis on Defendants' treatment of Stroder and Susan Duncan. Duncan and Stroder's situations were factually similar in several ways: they were hired at the same time; they shared the same training group; they held the same position within the same department; they were accountable to the same manager; and their probationary periods would end on the exact same day. Perhaps most significant of the similarities between Duncan and Stroder was the nature of their violations of the Cabinet's Internet Usage Policy.

Stroder's inappropriate e-mails mostly discussed non-work-related subjects like social engagements and contained references to his homosexual partner, as well as what witnesses describe as common homosexual terms (such as references to other homosexual men as "princess," "queen," and "bitch"). Duncan's e-mails similarly discussed social and personal topics like wedding planning and "thirsty Thursday." She also introduced a chain e-mail to other CHFS employees titled "Pampered Chef," which depicted numerous suggestively posed naked men, save only the pots, pans, and other kitchen items strategically placed to conceal their genitals. All parties agreed that one cannot distinguish between the quantity or context of the inappropriate e-mail usage by Stroder and Duncan.

According to Stroder, Duncan, and other witnesses at trial, casual and personal use of the internet and e-mail within CHFS was typical and tolerated.[5] The Puckett investigation inspired

---

[5] Numerous exhibits offered into evidence show that the extent of inappropriate internet usage within the Cabinet was staggering. Some e-mails are crass and include candid photos of scantily clad obese women in various public settings. Others include lengthy checklists that require employees to answer very personal and revealing questions about themselves, then calculate a score based on their answers to determine how their indecencies compare with those of their colleagues. In short, the e-mails of employees within the Cabinet illustrate rampant personal use of work computers.

more rigid enforcement. As a result, the Cabinet eventually terminated Puckett and Stroder, and investigated three other employees, including Duncan. Aside from Duncan, all four of these other employees were openly homosexual. Nevertheless, no direct evidence at trial revealed a blatant animus towards homosexuals within the Cabinet.[6]

The Cabinet, of course, is entitled to enforce its own internal policies. No doubt, countless Cabinet employees regularly used their computers for non-work-related matters. What is striking is that the Cabinet's sudden enforcement of the Internet Usage Policy focused disproportionately on homosexual employees and, more particularly, friendly homosexual bantering within e-mails. Of course, Stroder was not similarly situated to the other three homosexual men investigated by the Cabinet, because these others were not probationary employees. Therefore, while the Court finds insightful that implementation of the Cabinet's policy seemingly focused on homosexuals, the more important question concerns whether the Court can draw any conclusions as to Kent's motives by a comparison of her actions toward Stroder and Duncan.

Despite the strikingly similar actions of Stroder and Duncan, the Cabinet handled their potential violations of the Internet Usage Policy in dramatically different ways. Although Arnett advised Kent to investigate all probationary employees on the list of individuals identified for violating the Internet Usage Policy, Kent focused her efforts on Stroder. Among the four people Arnett identified, only Stroder and Duncan were probationary employees. Kent began her

---

[6]While other employees, both heterosexual and merit employees, were eventually disciplined for violating the Internet Usage Policy, these actions did not occur within scope of the Puckett investigation. In many cases, disciplinary actions taken against employees for violating the Internet Usage Policy occurred after Stroder filed this lawsuit or involved flagrant infractions, including the viewing of pornography and bestiality.

investigation by requesting both employees' snapshots on July 20, 2009. Kent testified that she did not know when Stroder and Duncan's requests would be processed or when she would receive their snapshots. However, she was aware of both individuals' last day as probationary employees and hoped the files would arrive before then.

On July 30, 2009, despite not knowing whether the snapshot files would arrive in the next 24 hours, Kent began discussing Stroder's termination with Arnett. In a series of e-mails they exchanged that day, Kent sought legal advice from Arnett, who was charged with reviewing personnel actions before Kent submitted recommendations to her supervisor. Arnett identified a series of inappropriate e-mail messages, purportedly to provide Kent with support to justify disciplinary action. Had Kent made the same inquiry regarding Duncan's known e-mails, the response would no doubt have been the same.

Kent never adequately explained why she contacted Arnett only concerning Stroder. Kent was unaware when either snapshot file would arrive. Supposedly, snapshots must be received and reviewed before disciplinary action is pursued. Kent nonetheless sought legal advice from Arnett to prepare Stroder's termination recommendation. In theory, Kent could have received both snapshots the following day, but she would have been prepared to terminate only Stroder. She failed to consult Arnett about Duncan, even though Arnett specifically counseled her to proceed quickly with probationary employees first, and instead pursued action only regarding Stroder.

Later that day, the e-mails, marked "high importance," explained that Stroder's "data is needed immediately because the state would like to be able to terminate the employee while in his probation period which ends July 31, 2009." Kent was copied on these messages, which

illustrate a relatively prompt exchange between various state employees, resulting in Stroder's snapshot file being created on 10:00 PM that evening. No similarly urgent correspondence was produced regarding Duncan. In fact, it was not until the next morning, on her last day as a probationary employee, that e-mails indicate her request was being processed. Duncan's snapshot request was referenced within an e-mail which also requested snapshots of two other non-probationary homosexual employees. The e-mail was not marked with any indication of high importance or urgency and made no mention of her probationary period ending that day. At trial, Defendants offered no explanation for the imperative nature of e-mails regarding Stroder, which contrast starkly to those addressing Duncan.

  The next morning, on July 31, Kent began preparing a memo recommending Stroder's termination. At some point that morning, she also received Stroder's snapshot, but it is unclear whether she actually had time to review it. Her final memo, which she later submitted to her supervisor, recited, almost verbatim, the e-mail she received the day before from Arnett. She could have done the same for Duncan based only on the Puckett e-mails. For example, Duncan's e-mail entitled "Pampered Chef" blatantly violated the Cabinet's Internet Usage Policy and easily surpasses in indecency the e-mails shared by Stroder. Kent's different approaches to the Stroder and Duncan violations is inexplicable and seems beyond mere coincidence.

  In the context of a court trial, different treatment of similarly situated employees permits but does not require a finder of fact to conclude that an employment decision was based on discriminatory animus. It is difficult to reconcile, however, that two employees, in such strikingly similar circumstances, could be treated so differently. The evidence suggests that Kent was determined to act on Stroder based upon the homosexual nature of his e-mail

interactions, leaving the Court to disbelieve that Kent decided to proceed with Stroder's termination first as a matter of mere happenstance. The Court therefore finds by a preponderance of the evidence that Defendants discriminated against Stroder because of his sexual orientation. As a consequence, Stroder was terminated; another who did the same things was spared. This is unfair and unequal treatment.

    The Court will enter an order consistent with this Memorandum Opinion and as necessary to resolve all remaining issues in this case.

cc:    Counsel of Record